# IN THE COURT OF APPEALS OF IOWA

No. 15-0045
Filed April 27, 2016

**PENNY WEHDE,**
        Petitioner-Appellant,

**vs.**

GEORGIA-PACIFIC CORRUGATED, L.L.C.,
ACE AMERICAN INSURANCE COMPANY,
        Respondents,

**and SECOND INJURY FUND OF IOWA,**
        Respondent-Appellee.
_____

        Appeal from the Iowa District Court for Polk County, Jeanie Kunkle Vaudt,

Judge.


        An injured worker appeals the district court's denial of her petition for

judicial review.  **AFFIRMED.**


        Bob Rush and Christoph Rupprecht of Rush & Nicholson, P.L.C., Cedar

Rapids, for appellant.

        Thomas J. Miller, Attorney General, and Jonathan D. Bergman and Julie

A. Burger, Assistant Attorneys General for appellee Second Injury Fund.


        Heard by Vogel, P.J., Doyle, J., and Eisenhauer, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2015).

**VOGEL, Presiding Judge.**

Penny Wehde appeals the district court's denial of her petition for judicial review, contending the district court erred in concluding the agency's factual findings regarding her industrial disability are supported by substantial evidence and the agency's evaluation of her industrial disability was not illogical, irrational, or wholly unjustifiable. Finally, Wehde asserts the district court incorrectly concluded the agency's taxation of costs to her was proper. The Second Injury Fund defends the district court's denial of Wehde's petition for judicial review.[1] Because we conclude substantial evidence supports the agency's factual findings and the agency's conclusion was not irrational, illogical, or wholly unjustifiable, we affirm the district court's denial of Wehde's judicial-review petition.

**I. Background Facts and Proceedings.**

Wehde sustained work-related injuries to both her left and right knees, in 2007 and 2008 respectively, while working for Georgia-Pacific Corrugated. She had arthroscopic surgery on the left knee in 2007 and 2008, and had arthroscopic surgery on the right knee in 2008. Following a contested hearing in front of the workers' compensation commission in February 2010, Wehde was awarded 4% permanent partial disability for the left leg and 12% permanent partial disability for the right leg. In addition, the agency concluded Wehde proved entitlement to benefits from the Second Injury Fund because she had

---

[1] Wehde's former employer, Georgia-Pacific Corrugated, and its insurer, Ace American Insurance Company, waived filing an appellee brief in light of the fact Wehde's appeal addresses only her claim for industrial disability and as such is directed only at the Second Injury Fund.

proved a qualifying first loss to an enumerated member (the left leg), proved a qualifying second loss to an enumerated member (the right leg), and proved her injuries resulted in permanent impairment ratings for both legs. The agency then determined Wehde's industrial disability as a result of the injuries to both knees was 35%. The employer was responsible for paying thirty-six weeks of benefits pursuant to the permanent partial disability for both knees, and the Second Injury Fund was responsible for paying the remaining weeks of payments (139 weeks) to total the 35% industrial disability assessment. The agency noted Wehde had permanent restrictions to avoid repetitive stair climbing and frequent standing.

Following the workers' compensation hearing, Wehde continued to have pain in both knees and sought treatment from the authorized treating physician, David S. Tearse, M.D. She had multiple injections into both knees and, ultimately, had a third arthroscopic surgery on the left knee after an MRI revealed a complex tear of the posterior horn of the medial meniscus. While Wehde was off work due to this third surgery on her left knee, Wehde's employer closed the plant, and Wehde lost her job. In June 2012, Dr. Tearse imposed permanent work restrictions of "sedentary/sit down work only—limited standing and walking," and he projected Wehde would be at maximum medical improvement on July 23, 2012. Wehde was also referred to physical therapy following surgery, and after thirty-five visits, Wehde was discharged on July 20, 2012, "able to ambulate and perform stairs without deviation and increase in pain." Wehde met all of her long-term therapy goals including having a pain rating at rest of 0/10 and no worse than 5/10 pain rating, returning to outdoor activities including walking and gardening, and implementing a home exercise program. Wehde followed up

again with Dr. Tearse in November 2012, receiving another round of injections in her left knee due to pain she was having, though she reported her right knee had been doing well.

Wehde filed a review-reopening petition on January 24, 2013, requesting additional compensation as a result of her knee injuries and subsequent aggravations. The matter was heard in August, and the agency filed its decision on October 2, 2013, granting Wehde an additional 8% permanent partial disability for loss of use of the left leg, no additional permanent partial disability benefits for the right leg, and no additional industrial disability benefits from the Second Injury Fund. In denying the claim for additional industrial disability benefits, the agency stated:

> The overall record evidence does not establish that claimant has a greater loss of earning capacity now than she did at the time of the February 2010 hearing. Her physical restrictions in the greater job market are essentially the same, even though she now has had a third meniscus surgery. Her activity limitations certainly are no worse than they were at the time of the February 2010 hearing and the July 2012 physical therapy report suggests they may have decreased. Hence, the record evidence does not show that the overall combined effect of claimant's first and second losses on her earning capacity has increased as a result of her additional loss of use to her left knee.
>
> Claimant did lose her job with the employer and claimant argues that loss represents an economic change of condition since her original award of benefits against the Fund. The job loss resulted from the employer's plant closing and not from the combined effects of the first and second injury, however.
>
> Furthermore, the presiding deputy at arbitration clearly considered the combined effects of claimant's loss of use of her knees on her capacity to earn in the competitive labor market in making the arbitration industrial benefit award. Indeed, the deputy expressly rejected any consideration of the accommodations and job modifications that the employer provided claimant.
>
> As claimant has shown neither that her additional loss of use to her left leg has resulted in an additional loss of earning capacity related to the combined effects of the overall loss of use to her left

and her right leg, nor that her loss of her job within the employer's plant related to the combined effects of her qualifying losses, claimant's claim of entitlement to review-reopening of the award against the Fund fails.

The decision also assessed costs related to the left leg to the employer, but costs that involved the files for both legs were to be shared between the employer, its carrier, and the claimant, except those costs wholly related to the claim of additional loss of earning capacity, which were assessed to Wehde. Wehde appealed this decision to the workers' compensation commissioner, who summarily affirmed the decision, assessing costs of the appeal to Wehde.

Wehde next filed a petition for judicial review with the district court on April 17, 2014. After receiving briefs and hearing oral argument from the parties, the district court denied the petition for judicial review on December 10, 2014, concluding "the Deputy's findings of fact adopted by the Commissioner are supported by substantial evidence" and "it is not irrational, illogical, or wholly unjustifiable to find that [Wehde's] industrial disability did not increase." Wehde appeals from this decision, challenging the substantial evidence supporting the factual findings of the agency and the agency's application of law to those factual findings.

## II. Scope and Standard of Review.

Iowa Code chapter 17A [2013] governs our review of the commissioner's decision. The district court acts in an appellate capacity when reviewing the commissioner's decisions to correct errors of law. "On appeal, we apply the standards of chapter 17A to determine whether we reach the same conclusions as the district court. If we reach the same conclusions, we affirm; otherwise we may reverse."

*Mike Brooks, Inc. v. House*, 843 N.W.2d 885, 888–89 (Iowa 2014) (citations omitted). "Our review of a decision of the workers' compensation commissioner varies depending on the type of error allegedly committed by the commissioner. . . . Because of the widely varying standards of review, it is 'essential for counsel to search for and pinpoint the precise claim of error on appeal.'" *Jacobson Transp. Co. v. Harris*, 778 N.W.2d 192, 196 (Iowa 2010) (citation omitted).

Here, Wehde first attacks the factual findings of the agency. When the factual findings of the agency are challenged, we only disturb those findings if we determine they are not supported by substantial evidence. *See* Iowa Code § 17A.19(10)(f). Substantial evidence is evidence of sufficient quantity and quality "that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance." *Id.* § 17A.19(10)(f)(1). We review the whole record before the court, but our review is limited to the findings actually made by the agency, not other findings the agency could have made. *Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 256 (Iowa 2012).

Wehde's next claim is that the agency incorrectly determined she failed to establish a loss of earning capacity sufficient to entitle her to a review-reopening award of industrial disability benefits. This is a challenge to the agency's application of law to fact (i.e., its ultimate conclusion) and is reviewed under Iowa Code section 17A.19(10)(m). We will disturb the agency's application of law to

the facts only when the agency's conclusion is "irrational, illogical, or wholly unjustifiable." *Burton*, 813 N.W.2d at 256 (quoting Iowa Code § 17A.19(10)(m)).

## III. Factual Findings.

Wehde challenges on appeal three factual findings made by the agency: (1) the physical restrictions are essentially the same from the original arbitration to the review-reopening; (2) the vocational expert, if consulted in 2010, would have made substantially the same findings as those provided in 2013; and (3) Wehde's job loss at Georgia-Pacific did not constitute a change in economic condition caused by the work injury. We will review each challenge in turn.

**A. Physical Restrictions.** Wehde first challenges the agency's finding, "Her physical restrictions in the greater job market are essentially the same, even though she now has had a third meniscus surgery." Wehde claims the undisputed record establishes her permanent physical restrictions changed substantially after the original hearing. She notes the authorized treating physician had not assigned any permanent restrictions as of the February 2010 arbitration hearing but had assigned permanent restrictions of "sedentary/sit down work only—limited standing and walking" in June 2012.

The agency noted in the review-reopening decision that Dr. Tearse did not impose any restrictions following the initial surgeries on Wehde's knees. However, the agency also noted restrictions had been imposed as of the time of the arbitration hearing by the doctor performing an independent medical evaluation, Farid Manshadi, M.D. In 2009, Dr. Manshadi recommended Wehde "avoid any activity which requires repetitious climbing of stairs. She is also to avoid any activity which requires frequent standing." The agency adopted these

permanent restrictions in the arbitration decision. The arbitration decision also noted Wehde, at that time, could not get down on her knees to garden, could not operate the clutch on the lawn mower, could not walk on the treadmill or use a stationary bike at home, could not go on long walks with her dog, could not go up and down stairs to do the laundry, could not climb a ladder, and could not take the garbage out for pick up unless the garbage can had wheels.

Three years later at the time of the review-reopening hearing, the agency noted Dr. Tearse had now imposed restrictions of sedentary work only. However, the agency also noted the final physical therapy evaluation, completed a month after Dr. Tearse imposed the new restrictions, found Wehde had met all of her long-term therapy goals. She had pain at rest rated at 0/10 and the pain was no worse than 5/10. She was able to return to outdoor activities including walking and gardening. Finally, she was able to resume a home exercise program. The agency also noted in the review-reopening decision that Dr. Manshadi had modified his original restrictions to recommend Wehde avoid prolonged standing or walking, avoid crouching, kneeling, and crawling, and avoid repetitive climbing of stairs.

While Wehde acknowledges that her physical limitations and tolerances may have been similar at the time of the arbitration hearing and at the time of the review-reopening hearing, she claims her actual doctor-imposed restrictions had changed. She maintains there is a difference between being unable to tolerate an activity due to pain and being restricted from doing an activity by a doctor. We acknowledge the terms tolerance and restriction have different meanings, but the distinction has little significance in Wehde's case. The reason the agency

compared Wehde's physical restrictions and activity limitations from the arbitration hearing and the review-reopening hearing was to determine whether Wehde could physically perform the same types of jobs at the time of the review-reopening hearing, as compared to what she was capable of doing in 2010 at the time of the arbitration hearing. The facts of the case support a conclusion that Wehde was as physically capable in August 2013 as she was in February 2010. In fact, it could also be concluded she was more physically capable based on the physical therapy discharge notes in July 2012. We thus conclude substantial evidence supports the agency's factual finding that Wehde's "physical restrictions in the greater job market are essentially the same, even though she now has had a third meniscus surgery."

**B. Vocational Expert.** Next, Wehde claims substantial evidence does not support the agency's finding with respect to what the vocational expert, Barbara Laughlin, would have said had she been consulted at the time of the original arbitration hearing. The agency stated in the review-reopening decision:

> As claimant had similar restrictions from Dr. Manshadi at that time and was doing her job for the employer with accommodation and modifications, it reasonably can be inferred that any conclusions and opinions Ms. Laughlin might have provided in 2010 would have been substantially the same as those she provided in June 2013.

Wehde claims the agency's statement is pure speculation, the agency failed to consider the change in Dr. Tearse's restrictions, and no reasonable person could conclude Laughlin would have come to the same conclusions regarding Wehde's employability in 2010.

As evidence in the review-reopening decision, Wehde submitted a vocational assessment completed by Laughlin on June 8, 2013, in which

Laughlin determined Wehde had a loss of 95.6% of unskilled occupations and 99.4% loss of generally transferable occupations as a result of her restriction to sedentary work with no prolonged walking or standing. This assessment was based on Dr. Manshadi's restrictions,[2] which had only slightly changed from 2009—"avoid any activity which requires repetitious climbing of stairs" and "avoid any activity which requires frequent standing"—to 2012—"avoid prolonged standing or walking, avoid repetitious crouching and no kneeling," "no crawling," and "avoid repetitious climbing of stairs."

Laughlin's assessment was also based on Wehde's statements regarding the problems she has in her daily life that were not present prior to the injury,[3] such as:

- More difficult[] to do laundry
- Shopping is harder due to the walking
- Now uses a handicapped sticker
- Has pain when she walks
- Husband now need[s] to help her clean the house, vacuuming is difficult
- Husband now cooks
- Sleep is interrupted by pain 1-2 times at night
- Her pain averages a 4 on a rising 1-10 scale
- She has difficulty lifting and carrying
- She has difficulty pushing and pulling
- She is uncomfortable sitting for prolonged periods of time
- She has difficulty bending, stooping, crouching, and kneeling
- She cannot stand longer than a few minutes at a time

The list of physical limitations given by Wehde to Laughlin in 2013 is remarkably similar to the list of physical limitations recorded by the agency in the arbitration decision in 2010. The arbitration decision stated:

---

[2] The report was completed before Dr. Tearse imposed any permanent restrictions on Wehde.
[3] Laughlin's report was issued before Wehde completed physical therapy.

Before her alleged work injuries, claimant engaged in flower and vegetable gardening. Now, she states she cannot get down on her knees to get rid of weeds and no longer gardens. She also no longer does lawn care as she cannot operate the clutch on her lawn tractor.

Before the alleged injuries, she exercised at home to lose weight. Now, she cannot walk on a treadmill or use a stationary bicycle, due to her knee pain. She also used to go on long walks with her dog, but now cannot do so because it hurts. She testified that going up and down stairs hurts her knees, and she cannot climb a ladder at all. She was able to use a step ladder before her alleged injuries but cannot do so now. Her husband now has to do the laundry, because she cannot handle the steps to the basement. She has gone to a garbage can with wheels in order to take garbage out for pickup. She also used to ride a bicycle, now her knees hurt too much. Her ability to do housekeeping is affected.

Given the similarity in restrictions from Dr. Manshadi in 2009 and 2012 and the similarity in physical limitations Wehde reported to Laughlin and to the agency at the arbitration hearing, we conclude substantial evidence supports the agency's finding in the review-reopening decision that "it reasonably can be inferred that any conclusions and opinions Ms. Laughlin might have provided in 2010 would have been substantially the same as those she provided in June 2013."

**C. Job Loss.** Finally, Wehde challenges the agency's finding in the review-reopening decision that Wehde's job loss was the result of the plant closing and not the result of her injuries. She asserts it was her restriction to sedentary work as a result of the final knee surgery that precluded her ability to return to her occupation. She claims even if the plant had remained open, there would have been no job for her in light of her sedentary work restrictions from Dr. Tearse.

Again, looking at the evidence before the agency, Wehde's physical limitations were similar, and may have even been improved, from the time of the

arbitration hearing in 2010 to the time of the review-reopening hearing in 2013. Also, it is clear in the record that in 2010, Wehde, despite her physical limitations, could still perform her job duties. While Wehde maintains the new sedentary restriction from Dr. Tearse would result in being unable to perform her job if the plant had remained open, the facts of the case support the finding that a similar restriction from Dr. Manshadi had not prevented Wehde from returning to her job in 2010. In 2012, when Wehde was at maximum medical improvement, she did not have a job to return to because the plant closed while she was on leave recovering from her third surgery on her left knee. We conclude the facts support the agency's finding, "The job loss resulted from the employer's plant closing and not from the combined effects of the first and second injury."

**IV. Application of Law to the Facts—Industrial Disability.**

Wehde's next claim focuses on the agency's ultimate conclusion that Wehde did not prove she suffered a loss of earning capacity sufficient to justify an additional award of industrial disability. As Wehde correctly notes, this issue is properly reviewed under Iowa Code section 17A.19(10)(m) to determine whether the agency's conclusion was an "irrational, illogical, or wholly unjustifiable" application of law to the facts.

In a review-reopening proceeding, the inquiry is "whether or not the condition of the employee warrants an end to, diminishment of, or increase of compensation." *See* Iowa Code § 86.14(2). An injured worker is entitled to benefits in a review-reopening proceeding if the worker proves "by a preponderance of the evidence that [her] current condition is 'proximately caused by the original injury.'" *See Kohlhaas v. Hog Slat, Inc.*, 777 N.W.2d 387, 392

(Iowa 2009) (citation omitted). Worsening of the worker's physical condition is one way to prove entitlement to benefits in a review-reopening, but a worker may also be entitled to benefits if the worker proves: "a temporary disability later develop[ed] into a permanent disability," "critical facts existed but were unknown and could not have been discovered by the exercise of reasonable diligence at the time of the prior settlement or award," or "an injury to a scheduled member later caused an industrial disability." *Id.* at 392–93.

Wehde claims the agency failed to adequately consider the change in her work restrictions, permanent impairment rating, employment status, earning capacity, medical treatment, motivation, and age. As we have previously stated, substantial evidence supports the agency's determinations that Wehde's work restrictions remained essentially the same, that she experienced a job loss not due to her injury but because of the employer closing the plant, and the 2013 vocational assessment would have been substantially the same if it had been performed in 2010.

Wehde's permanent impairment in her left leg did increase as a result of the third arthroscopic surgery on her knee. However, the agency determined Wehde did not prove additional permanent impairment for the right knee because no additional injury occurred to this knee after the 2010 arbitration decision and the only medical treatment administered to this knee was palliative injections. These injections were clearly working as Wehde reported to Dr. Tearse in November 2012 that her right knee "has been doing pretty well lately." Wehde did not seek review of the agency's determination that she is not entitled to additional permanent partial disability benefits for the right knee.

The arbitration decision did consider her age, then forty-eight, when assessing the 35% industrial disability—"Her age works against her in competing for jobs in the employment market if she were to find herself without a job." Wehde points out that the review-reopening hearing was almost four years after the arbitration hearing, making her fifty-two, but she does not indicate how those additional years had an impact on her industrial disability. The simple passage of time is not sufficient to justify a review-reopening award.

Wehde also does not indicate how her motivation to take classes to retrain as an accountant impacts her industrial disability. She simply asserts the agency ignored her motivation without any indication as to how that motivation should have resulted in an increased award from the Second Injury Fund. The same can be said for her claim the agency wrongly ignored the fact that her treating physician has prescribed assistive devices such as a knee brace for her left knee, a heel wedge, and a TENS unit for pain. There is no indication in the record that these devices were not permitted at her former job or would preclude her from working.

Upon our review of the agency's application of law to the facts in determining whether Wehde was entitled to an additional award of industrial disability benefits from the Second Injury Fund, we conclude the agency's decision was not illogical, irrational, or wholly unjustifiable.

**V. Assessment of Agency Costs.**

Finally, Wehde claims the agency erred in taxing costs of the review-reopening case to her. She claims that for the reasons set forth in her appeal brief, it was an abuse of discretion to tax the costs to her. Because we conclude

the agency made no error in its decision denying her an additional award of industrial disability from the Second Injury Fund, we likewise find no abuse of discretion in the agency's assessment of costs to Wehde. *See* Iowa Code § 86.40 ("All costs incurred in the hearing before the commissioner shall be taxed in the discretion of the commissioner.").

## VI. Conclusion.

Upon our review of the record, we agree with the district court substantial evidence supports the agency's factual finding and the agency's conclusion Wehde was not entitled to an additional award of industrial disability benefits is not irrational, illogical, or wholly unjustifiable. We also affirm the district court's conclusion the agency did not abuse its discretion in assessing costs to Wehde.

**AFFIRMED.**